UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARIUS COPELAND,

                Plaintiff,                                    Case No. 19-13404

vs.                                            HON. MARK A. GOLDSMITH

CORY SADLER, et al.,

                Defendants.

_____/

## OPINION & ORDER
### (1) DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 31); (2) GRANTING DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT (Dkt. 30); (3) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AS TO PLAINTIFF'S FOURTH AMENDMENT SEARCH CLAIM AGAINST DEFENDANTS MCKINSTRY AND OTTER (Dkt. 34); (4) PROVIDING RULE 56(f) NOTICE TO THE PARTIES; AND (5) SETTING DEADLINES FOR THE PARTIES TO RESPOND TO THE COURT'S RULE 56(f) NOTICE

This is a civil rights action brought by Plaintiff Darius Copeland against Defendants Officers Cory Sadler, Nathanial McKinstry, Detective Jason Otter, and the City of Romulus. Copeland brings claims pursuant to 42 U.S.C. § 1983 against the officers in their individual and official capacities for (i) use of excessive force and illegal search and seizure, all in violation of the Fourth Amendment; (ii) deprivation of "procedural and substantive due process and fair treatment," in violation of the Fourth and Fourteenth Amendments; and (iii) retaliation for the use of protected speech, in violation of the First Amendment. Compl. ¶¶ 22-25 (Dkt. 1-2). Copeland also brings state law claims of assault and battery, false arrest, false imprisonment, and gross negligence against the officers. Id. ¶¶ 30-47. In addition, Copeland brings a municipal liability claim against the City, alleging various failures such as the failure to adequately train officers on the need to obtain a warrant before entering a person's garage. Id. ¶¶ 26-29.

1

This matter is now before the Court on the parties' cross motions for partial summary judgment. Copeland seeks summary judgment on (i) his Fourth Amendment claims for wrongful search and arrest against the officers and (ii) the municipal claim against the City with respect to its alleged failure to train officers on the need for a warrant prior to entry into a person's garage (Dkt. 31). Defendants seek summary judgment on (i) the official capacity claims against the officers and (ii) the municipal liability claim against the City (Dkt. 30). In their response to Copeland's motion for partial judgment, Defendants add that they seek summary judgment on Copeland's wrongful search claim against McKinstry and Otter, arguing that McKinstry and Otter are entitled to qualified immunity (Dkt. 34).

For the following reasons, the Court denies Copeland's motion and grants Defendants' motions. Further, pursuant to Federal Rule of Civil Procedure 56(f), the Court provides the parties with notice that it is considering entering summary judgment on Copeland's Fourth Amendment search and seizure claims in favor of Defendants and against Copeland. As discussed below, the Court will provide the parties with an opportunity to respond to this Rule 56(f) notice.

## I. BACKGROUND

The following material facts are not in dispute. On or about June 25, 2017, a caller speaking to a dispatcher reported a possible drunk driver whom the caller was following. Sadler Dep., Ex. 1 to Pl. Mot. for Summary Judgment ("MSJ") at PageID.494 (Dkt. 31-1). Sadler, who was patrolling in a single car, spoke with the dispatcher and was informed that the vehicle had turned into the driveway of 32058 Bruce Street in Romulus, just a few streets north of where Sadler was at the time. Id. Sadler drove to this address and, when he arrived, saw a vehicle parked in the driveway and an individual—later identified as Copeland—standing in the driveway waving his hand. Id. at PageID.495. The vehicle's headlights were on, aiming at the garage at the end of the

driveway.  Id. at PageID.494-495.  The garage was attached to a home, and the garage door was completely open.  Id. at PageID.495, 504.

Sadler exited his car and attempted to question Copeland about the reported drunk driving offense.  Id. at PageID.495.  Copeland began walking away from Sadler, stating that Copeland was not the man that Sadler was looking for, and that the actual culprit had gone down the street.  Id.  Sadler followed Copeland, asking him to stop and talk.  Id.  Copeland ignored Sadler, walking away from Sadler and into the open garage at the end of the driveway.  Id.  Copeland approached a door connecting the garage to the house and began inserting various keys into the door, but none unlocked the door.  Id.  Sadler later testified that, in that moment, he was concerned that the home was not Copeland's, based on Sadler's "experience of people trying to avoid talking to the police [who] would pull into a driveway and to a home they don't belong to just to try to make you move on your way."  Id. at PageID.503.

Sadler entered the open garage and continued to ask Copeland to stop and speak with him.  Id. at PageID.495-496.   When Copeland did not do so, Sadler put his hand on Copeland's right arm and asked him to "step with [him] and speak with [him] more."  Id. at PageID.496.  Copeland curled his arm and in response Sadler did a wrist lock on Copeland.  Id.  Sadler told Copeland that he was going to handcuff Copeland for both of their safeties.  Id. Copeland then permitted Sadler to handcuff him.  Id.  After handcuffing Copeland, Sadler turned Copeland around so that they could speak.  Id.  Copeland began to get upset.  Id.  He told Sadler that the home was his; specifically, he said that the home was a rental property and that Copeland was staying there temporarily because of issues with his wife.  Id.  Copeland told Sadler that he had no right to be in Copeland's home.  Id.

Otter and McKinstry, who were patrolling in a single vehicle together, were also dispatched to respond to the reported drunk driving incident.  Id. at PageID.494.  When they arrived at the Bruce Street address, they saw a vehicle parked in the driveway and observed Sadler standing in the garage next to Copeland in handcuffs.  Otter Dep., Ex. 2 to Pl. MSJ at PageID.520-521 (Dkt. 31-2); McKinstry Dep., Ex. 3 to Pl. MSJ at PageID.541 (Dkt. 31-3).  Otter and McKinstry entered the garage to stand by Sadler "to make sure he was safe and everything was under control." McKinstry Dep. at PageID.541.  Otter and McKinstry each observed that Copeland was acting belligerently, shouting and using profanities.  Otter Dep. at PageID.521; McKinstry Dep. at PageID.541-542.  Sadler informed Otter and McKinstry that he was trying to determine whether Copeland was the drunk driver.  Otter Dep. at PageID.521; McKinstry Dep. at PageID.541.

Otter and McKinstry stayed with Copeland in the garage while Sadler temporarily left the garage to contact the caller who had reported the drunk driving incident.  Sadler Dep. at PageID.497.  Sadler asked the caller to come to 32058 Bruce Street.  Id.  The caller did so and, once he arrived, verified that the vehicle in the driveway was the one that he had followed.  Id. However, the caller was unable to recall whether Copeland was the driver of the vehicle.  Id. at PageID.498.

Sadler located Copeland's license in the vehicle.  Id.  He checked Copeland's license and determined that the address listed on the license did not match the Bruce Street address.  Id. at PageID.503.  Sadler decided to run the information listed on Copeland's license through the law enforcement information network.  Id. at PageID.498.  The search returned a preexisting domestic violence warrant for Copeland from Van Buren Township.  Id.  Sadler spoke with a dispatcher, who confirmed that the warrant was valid and that Van Buren officials wanted Copeland arrested on the warrant.  Id. at PageID.498-499.  Sadler returned to the garage, where he advised Copeland

that he was being arrested on the warrant from Van Buren.  Id. at PageID.499.  Otter and McKinstry escorted Copeland to their patrol car and then transported him to the Van Buren jail.  Id.

Following the subject incident, Sadler testified that he could not recall whether he had ever received formal training regarding the need to obtain a warrant before entering a garage.  Sadler Dep. at PageID.503.  Otter testified that he has attended "legal update classes," but not "specific training" on warrantless entries of garages.  Otter Dep. at PageID.526.  McKinstry was not specifically asked during his deposition whether he had ever received training on the need to obtain a warrant before entering a garage.  Each of the officers testified that he had received training on how to respond if an arrestee complains of handcuffs being too tight.  Sadler Dep. at PageID.504; Otter Dep. at PageID.527; McKinstry Dep. at PageID.544.

## II.  STANDARD OF DECISION

Federal Rule of Civil Procedure 56 governs motions for summary judgment in federal court.  Typically, summary judgment is granted based on motions and arguments raised in the moving parties' briefs, pursuant to Rule 56(a).  A motion for summary judgment under Rule 56(a) shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  Scott v. Harris, 550 U.S. 372, 380 (2007).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).  The moving party may discharge its burden by showing "that there is an absence of evidence to support the nonmoving

party's case."  Horton v. Potter, 369 F.3d 906, 909 (6th Cir. 2004) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)).

Rule 56(f) also provides a mechanism by which judgment may be granted independent of any motions filed by the parties.  Specifically, Rule 56(f) provides that, "after giving notice and a reasonable time to respond," the Court may: (i) "grant summary judgment for a nonmovant"; (ii) "grant the motion on grounds not raised by a party"; or (iii) "consider summary judgment on its own after identifying for the parties material facts that may not be genuinely in dispute."  Fed. R. Civ. P. 56(f)(1)-(3).

### III. DISCUSSION

#### A.   Official Capacity Claims Against the Officers

Defendants argue that "[b]ecause official capacity claims are the equivalent of a suit against the government entity, and as the City is a named defendant in this matter, Plaintiff's official capacity claims are duplicative" and, therefore, "[t]his duplicity warrants the dismissal of the official capacity claims."  Defs. MSJ at 10 (citing Ebelt v. County of Ogemaw, 231 F. Supp. 2d 563, 568 (E.D. Mich. 2002)) (other citation omitted).  Copeland responds that he "agrees to dismiss/strike the caption which indicates a claim in the officers' official capacity . . . ."  Pl. Resp. to Defs. MSJ at PageID.554 (Dkt. 32).  Accordingly, the Court grants Defendants' motion as to their request for dismissal of Copeland's official capacity claims against the officers.

#### B.   Municipal Liability Claim

Copeland moves for summary judgment on his municipal liability claim, but only with respect to the City's alleged failure to train its officers regarding the need to obtain a warrant before entering a person's garage.  Defendants move for summary judgment with respect to the entire

municipal liability claim.  The Court addresses the City's alleged failure to train its officers before addressing the municipal liability claim in its entirety.

### i.  The Alleged Failure to Train Regarding Warrantless Entries of Garages

A municipality is not vicariously liable in a § 1983 action merely because it employs someone who has committed a constitutional violation.  See Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658, 694 (1978).  Instead, a municipality may be held liable where a plaintiff demonstrates that the alleged federal violation occurred because of a municipal policy or custom.  See id.  The plaintiff must "(1) identify the municipal policy or custom, (2) connect the policy to the municipality, and (3) show that his particular injury was incurred due to execution of that policy." Turner v. City of Taylor, 412 F.3d 629, 639 (6th Cir. 2005) (internal quotation marks and citation omitted).  In order for a municipality's failure to train its employees to be properly thought of as a "policy or custom" that is actionable under § 1983, the failure to train must "amount[] to deliberate indifference to the rights of persons with whom the police come into contact."  City of Canton, Ohio v. Harris, 489 U.S. 378, 388-389 (1989).

Copeland argues that the City failed to train its officers on the need to obtain a warrant before entering a garage.  Pl. MSJ at 12.  The only proof regarding some failure of the City to train its officers consists of (i) Sadler's deposition testimony that he could not recall whether he had ever received formal training regarding the need to obtain a warrant before entering a garage and (ii) Otter's testimony that he has attended "legal update classes," but not "specific training" on warrantless entries of garages.  Because Sadler testified that he could not recall whether he received training, his testimony does not establish that the City did or did not provide him or others with formal training.  This means that Copeland only has Otter's testimony as factual support for his argument.  However, Otter's testimony, alone, cannot establish the City's liability.  As the

7

Supreme Court has explained, "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city, for the officer's shortcomings may have resulted from factors other than a faulty training program." City of Canton, 489 U.S. at 390-391; see also Freije v. Montmorency Cnty., No. 16-12251, 2018 WL 3428667, at *8 (E.D. Mich. July 16, 2018).

As a result, Copeland has failed to point to undisputed material facts proving his entitlement to judgment as a matter of law with respect to his municipal liability claim for failure to train on the need to obtain a warrant before entering a garage. Accordingly, the Court denies Copeland's motion for summary judgment as to this claim.

### ii.  The Entire Municipal Liability Claim

"[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion[] and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact . . . ." Celotex, 477 U.S. at 323 (internal citation omitted). The movant may do so by merely identifying that the nonmoving party lacks evidence to support an essential element of his case with respect to which the nonmoving party has the burden of proof. Id.

Here, Defendants argue that they are entitled to summary judgment on the entire municipal liability claim because "there is no . . . evidence that the City maintains violative customs or policies." Defs. MSJ at 15. Moreover, Defendants argue, the record contains evidence affirmatively disproving certain allegations of the municipal liability claim. For example, Defendants argue, with respect to the alleged failure to train officers on the proper use of force, the officers' deposition testimonies and training records show that they have all received "training on what to do when individuals complain about their handcuffs being too tight." Id. at 15-16 (citing Sadler Dep., Ex. B; Otter Dep., Ex. C; McKinstry Dep., Ex. D; and Officer Training

Records, Ex. J to Def. MSJ (Dkts. 30-3, 30-4, 30-5, 30-11)).  Defendants have satisfied their initial responsibility by identifying Copeland's lack of evidence to support an essential element of his municipal liability claim.

Once a movant identifies that the nonmoving party lacks evidence to support an essential element of his case with respect to which the nonmoving party has the burden of proof, as Defendants have done here, the nonmoving party must come forward with some kind of evidentiary material beyond the pleadings themselves and designate specific facts showing that there is a genuine issue for trial.  Celotex, 477 U.S. at 323.

In response to Defendants' motion, Copeland points to the same evidence that he did in his own motion for summary judgment regarding the City's alleged failure to train on the need to obtain a warrant before entering a garage.  For the reasons discussed above, this evidence does not establish a genuine issue for trial.  Copeland does not submit any other evidence to controvert Defendants' position.  As a result, Copeland has failed to produce any evidence to identify a municipal policy or custom, let alone any evidence to connect the policy to the municipality and show that his particular injury was incurred due to execution of that policy.

Because Copeland lacks sufficient evidence to establish essential elements of his municipal liability claim, there is no genuine issue as to any material fact regarding this claim.  See id. at 322-323.  Accordingly, Defendants are entitled to summary judgment on this claim as a matter of law.  See id.; Williams v. Ford Motor Co., 187 F.3d 533, 537-538 (6th Cir. 1999).

### C.  Fourth Amendment Search Claim

Copeland seeks summary judgment on his Fourth Amendment search claim, arguing that the officers wrongfully entered his garage.  Defendants seek summary judgment on Copeland's claim that McKinstry and Otter wrongfully entered the garage, arguing that McKinstry and Otter

are entitled to qualified immunity.  The Court addresses the issue of whether Copeland is entitled to summary judgment separately from the issue of McKinstry and Otter's claim of qualified immunity.

### i.  Copeland's Motion for Summary Judgment

Copeland's Fourth Amendment wrongful search claim is premised on the assumption that the home located at 32058 Bruce Street—and, by extension, the garage attached to the home—were his at the time of the subject incident.  Defendants challenge this assumption, arguing, "Even if Plaintiff can establish that it was his home, that he was not the drunk driver Defendant Officer Sadler was investigating, and that no one else was in the home that could present a danger, summary judgment in Plaintiff's favor is still improper."  Defs. Resp. to Pl. MSJ at 19 (Dkt. 34).

Fourth Amendment rights are personal rights and, therefore, may not be vicariously asserted.  See Rakas v. Illinois, 439 U.S. 128, 133-134 (1978).  Although some courts label the issue as one of "standing," the issue is really a "substantive question of whether or not the [claimant] . . . has had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge."  Id. at 133.  As the Supreme Court has explained:

> [I]n order to claim the protection of the Fourth Amendment, a [claimant] must demonstrate that he personally has an expectation of privacy in the place searched, and that his expectation is reasonable; i.e., one which has "a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society."

Minnesota v. Carter, 525 U.S. 83, 88 (1998) (quoting Rakas, 439 U.S. at 143-144).  The text of the Fourth Amendment suggests that its protections extend only to people in "their" houses.  Id. at 89.  However, caselaw interpreting this text has held that, in some circumstances, a person may have a legitimate expectation of privacy in the house of someone else, such as an overnight guest. Id. (discussing Minnesota v. Olson, 495 U.S. 91 (1990)).

The party challenging the legality of the search bears the burden of showing he had a reasonable expectation of privacy in the place searched.  United States v. Larry, 129 F. App'x 127, 130 (6th Cir. 2005) (citing Rakas, 439 U.S. at 130 n.1.); see also Gillard v. Schmidt, 579 F.2d 825, 828 (3rd Cir. 1978) (stating that to establish an action under § 1983 based upon violation of Fourth Amendment rights, plaintiff must demonstrate "a reasonable expectation of freedom from governmental intrusion" in the residence) (internal quotation marks and citation omitted).  If the movant fails to establish that he had a legitimate expectation of privacy in the place searched, the Court need not decide whether officers' entry into that place was reasonable.  See Carter, 525 U.S. at 91.

The only record evidence related to Copeland's legitimate expectation of privacy in the home are Sadler's and Copeland's deposition testimony that, during the incident, Copeland told the officers that the home was his.  Specifically, Copeland testified that he told the officers: "I live at this residence."  Copeland Dep., Ex. 5 to Pl. Resp. to Defs. MSJ at PageID.649 (Dkt. 32-5). Sadler testified that Copeland told him that he was renting the home and staying there temporarily due to issues with his wife.  Sadler Dep. at PageID.496.

There are two issues with Copeland's complete reliance on his own statement to prove his legitimate expectation of privacy in the home.  First, this out-of-court statement is being offered to prove the truth of the matter asserted by the statement and, therefore, is hearsay.  See Fed. R. Evid. 801(c).  Hearsay evidence cannot be considered on a motion for summary judgment.  Wiley v. United States, 20 F.3d 222, 225-226 (6th Cir. 1994).

Second, Copeland has not put forth any affirmative evidence to support his own bare assertion that the home was his.  Copeland's failure to substantiate his bare assertion means that he has failed to carry his burden in demonstrating that he had a legitimate expectation of privacy

in the house.  See United States v. Reyes-Bosque, 596 F.3d 1017, 1027 (9th Cir. 2010) (stating that a defendant's "bald assertion that he was an overnight guest . . . is not sufficient to establish that he had a legitimate expectation of privacy in [the place searched]"); Jones v. Lewis, 874 F.2d 1125, 1134-1135 (6th Cir. 1989) (Krupansky, J., concurring in part and dissenting in part) ("A plaintiff asserting a civil action for violation of Fourth Amendment rights must accordingly introduce affirmative proof that he possessed an interest in and involvement with the residence entered which society was prepared to recognize and protect as reasonable under the circumstances."); United States v. Mills, 357 F. Supp. 3d 634, 643 (E.D. Mich. Jan. 16, 2019) ("[The defendant] has failed to carry his burden of demonstrating that he had a legitimate expectation of privacy in the [house] . . . . His conclusory assertion of being an overnight guest, standing alone with no factual support in the record, is simply insufficient.") (citations omitted).

Because Copeland has failed to provide any factual support to show his legitimate expectation of privacy in the garage—the place that the officers "searched" by entering it—he is not entitled to summary judgment on his Fourth Amendment search claim against the officers.

### ii.  McKinstry and Otter's Qualified Immunity Claim

Even assuming that the home was Copeland's at the time of the incident, McKinstry and Otter are nevertheless entitled to summary judgment on the Fourth Amendment search claim against them, on the basis of qualified immunity.  Deciding whether government officials are entitled to qualified immunity "is purely a question of law for the district court."  Poe v. Haydon, 853 F.2d 418, 424 (6th Cir. 1988).  To overcome the defense of qualified immunity, a plaintiff must show that, when the facts are viewed in the light most favorable to him, (i) the defendant violated the plaintiff's constitutional rights that (ii) were clearly established at the time of the violation.  See Pearson v. Callahan, 555 U.S. 223, 232 (2009).  "An answer of 'yes' to both of the

qualified immunity questions defeats qualified immunity, while an answer of 'no' to either question results in a grant of qualified immunity." Haley v. Elsmere Police Dep't, 452 F. App'x 623, 626 (6th Cir. 2011).   The qualified immunity doctrine focuses on "the objective reasonableness of an official's conduct, as measured by reference to clearly established law" to "avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Although the defendant must initially raise the defense of qualified immunity, "[t]he ultimate burden of proof is on the plaintiff to show that the defendant is not entitled to qualified immunity." Sheets v. Mullins, 287 F.3d 581, 586 (6th Cir. 2002) (citation omitted).

A plaintiff's rights are clearly established when, at the time of the challenged conduct, "[t]he contours of [a] right [are] sufficiently clear" such that every "reasonable official would [have understood] that what he is doing violates that right." Anderson v. Creighton, 483 U.S. 635, 640 (1987).  While a case directly on point is not required, existing precedent must have placed the statutory or constitutional question beyond debate. Malley v. Briggs, 475 U.S. 335, 341 (1986). In other words, the plaintiff must generally identify a case with a fact pattern similar enough to have given "fair and clear warning to officers" about what the law requires. White v. Pauly, 137 S. Ct. 548, 552 (2017).

The Supreme Court has "repeatedly told courts . . . not to define clearly established law at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011) (citations omitted). Thus, "[t]he general proposition . . . that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established." Id.; see also Gradisher v. City of Akron, 794 F.3d 574, 584 (6th Cir. 2015) (holding that the plaintiff "frame[d] the issue at too high a level of generality" by framing the issue

as whether the "right to be free from a warrantless forced entry absent exigent circumstances was clearly established on [the date of the subject incident] . . .").

The Court is unaware of any case holding that it is unreasonable for officers responding to a drunk driving report to enter an open garage to aid their fellow officer who is already inside the open garage with a handcuffed suspect.  Copeland has failed to point the Court to any such case directly on point, or any case otherwise placing the constitutional question beyond debate.  In the absence of such case law, both the Supreme Court and the Sixth Circuit have held that an officer is entitled to the benefit of the doubt that he did not violate any clearly established right.  See al-Kidd, 563 U.S. at 741; Gradisher, 794 F.3d at 585.

Nor would any potential violation be obvious to a reasonable officer.  Courts asses the reasonableness of an officer's actions based on "what information was clear or should have been clear to the individual officer at the time of the incident" and "what information that officer was reasonably entitled to rely on in deciding how to act, based on an objective reading of the information."  Brown v. Lewis, 779 F.3d 401, 413 (6th Cir. 2015) (citing Humphrey v. Mabry, 482 F.3d 840, 848 (6th Cir. 2007)).  Police officers have the right to rely upon information they receive from other officers in entering a home absent clear, contradictory evidence.  See Hardesty v. Hamburg Township, 461 F.3d 646, 656 (6th Cir. 2006), abrogated on other grounds by Florida v. Jardines, 569 U.S. 1 (2013).  Further, police officers have the "right to rely on dispatch information."  Dorsey v. Barber, 517 F.3d 389, 396 (6th Cir. 2008).

Before arriving at the scene, McKinstry and Otter were informed by the dispatcher that a caller had reported seeing a drunk driver turn into the driveway of 32058 Bruce Street.  Upon arriving at the scene, McKinstry and Otter observed a vehicle parked in the driveway and saw Sadler in the open garage with a man in handcuffs.  Based on the sum of this information—upon

14

which McKinstry and Otter were entitled to rely—reasonable officers would believe that they were entitled to enter the open garage to help their fellow officer safely handle the handcuffed suspect. Under these circumstances, reasonable officers would not believe that they had to conduct their own independent investigation into the constitutionality of entering the open garage before helping their fellow officer.  As a result, reasonable officers in McKinstry's and Otter's position would not have believed that entering the open garage would violate Copeland's constitutional rights.

For the foregoing reasons, Copeland has failed to meet his burden of showing that McKinstry and Otter are not entitled to qualified immunity on the Fourth Amendment search claim against them.  Accordingly, the Court grants Defendants' motion for summary judgment on this claim against McKinstry and Otter.

### D.  Fourth Amendment Arrest Claim

The Fourth Amendment prohibits, among other things, unreasonable seizures.  The test for when the individual has been seized is whether a reasonable person in those circumstances would have felt he or she was not free to leave.  Michigan v. Chesternut, 486 U.S. 567, 573 (1988); United States v. Smith, 594 F.3d 530, 536 (6th Cir. 2010).  The Fourth Amendment's prohibition against unreasonable seizures applies to both (i) investigative stops, see United States v. Waldon, 206 F.3d 597, 602 (6th Cir. 2000), and (ii) arrests, see Payton v. New York, 445 U.S. 573, 585 (1980). Although arrests and stops are both considered seizures for Fourth Amendment purposes, the mere stopping of an individual to make an inquiry falls short of an arrest.  Terry v. Ohio, 392 U.S. 1, 11 n.5 (1968).  This is because an arrest requires either physical force, such as the "laying on of hands or application of physical force to restrain movement," or, where that is absent, submission to the assertion of authority.  California v. Hodari D., 499 U.S. 621, 626 (1991) (citations omitted). Further, whereas an arrest must be supported by probable cause that a crime has been committed

to satisfy the Fourth Amendment's reasonableness requirement, a stop need only be supported by reasonable suspicion that crime is afoot. United States v. Hill, 195 F.3d 258, 264 (6th Cir. 1999).

In his complaint, Copeland appears to challenge both (i) his arrest on the outstanding warrant as well as (ii) the stop that occurred before the arrest; he alleges that the officers did not have either reasonable suspicion or probable cause to seize him. See Compl. ¶8. However, Copeland's motion for partial summary judgment is devoid of any mention of reasonable suspicion; rather, it focuses on the officers' alleged lack of probable cause to arrest him. Specifically, Copeland seeks summary judgment on his wrongful arrest claim, arguing that the officers had no warrant or probable cause for arresting him. Pl. MSJ at 8. Defendants argue that the preexisting domestic violence warrant from Van Buren gave the officers probable cause to arrest Copeland. Defs. Resp. to Pl. MSJ at 22.

The Court confines its Rule 56(a) ruling on Copeland's seizure claim to the issue on which Copeland has expressly sought summary judgment—wrongful arrest. However, to reach its ruling, the Court must first assess whether a valid stop preceded the arrest, and, if so, precisely when this stop converted into an arrest. The timing of the arrest is a threshold issue that must be resolved before reaching the merits of Copeland's motion for summary judgment on his wrongful arrest claim, as the test for whether officers had probable cause to make an arrest is assessed as of the moment the arrest was made. See Nieves v. Bartlett, 139 S. Ct. 1715, 1728 (2019).

### i. Sadler Had Reasonable Suspicion to Stop Copeland

Reasonable suspicion requires "more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." States v. Lyons, 687 F.3d 754, 763 (6th Cir. 2012) (citation omitted). Courts determine whether an officer has the requisite quantum of proof by

16

looking at the totality of the circumstances.  United States v. Galaviz, 645 F.3d 347, 353 (6th Cir. 2011); see also United States v. Perez, 440 F.3d 363, 371 (6th Cir. 2006) (stating that courts must "determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately"). "Pertinent circumstances include the officer's own direct observations, dispatch information, directions from other officers, and the nature of the area and time of day during which the suspicious activity occurred."  United States v. Campbell, 549 F.3d 364, 371 (6th Cir. 2008).

Caselaw demonstrates that reasonable suspicion is indeed a low standard to satisfy.  For instance, in United States v. Anderson, the district court held that officers had reasonable suspicion to detain four individuals for brief questioning where the officers observed the four individuals standing in front of a dark, apparently vacant house in an area known for drug activity.  273 F. Supp. 2d 921, 928 (E.D. Mich. 2003).

 In this case, Sadler had at least as strong a basis for suspecting that Copeland had committed the reported drunk driving offense.  The dispatcher informed Sadler that a caller had reported seeing a drunk driver pull into 32058 Bruce Street.  Sadler was just a few blocks away, and, upon obtaining this address, promptly headed there.  When he arrived, Sadler found Copeland standing in the driveway of the exact address the caller reported seeing the drunk driver pull into. In addition, Sadler saw a car parked in the driveway.  Under the totality of the circumstances, Sadler had reasonable suspicion to believe that Copeland had just committed the reported drunk driving offense.  He was, therefore, justified in attempting to stop Copeland to question him about the reported drunk driving offense.

The Court's conclusion that Sadler had reasonable suspicion to stop Copeland is not altered by Copeland's argument that Sadler did not identify the vehicle parked in the driveway as the

"listed target vehicle"—i.e., the exact vehicle reported by the caller—at the time Sadler approached the driveway. Pl. Reply in Support of Pl. MSJ at 2 (Dkt. 37). Shortly after the caller reported seeing the suspected drunk driver pull into 32058 Bruce Street, Sadler arrived at the scene and saw a car parked in the driveway. The record does not reflect that any other cars were parked in the driveway. Further, the record does not reflect that Sadler determined that the sole vehicle parked in the driveway was not the one reported by the caller. Thus, it was reasonable for Sadler to conclude that the vehicle parked in the driveway was the one the caller had reported. And, in turn, it was reasonable for Sadler to conclude that the person standing next to the vehicle—who was the only person on the premises—was the drunk driver.

Nor is the Court's conclusion altered by Copeland's argument that Sadler did not smell any intoxicants until handcuffing Copeland in the garage. Pl. Reply in Support of Pl. MSJ at 3 (citing Sadler Dep. at PageID.496). It is not necessary for an officer to smell alcohol on a suspect before stopping him to question him about a reported drunk driving offense, provided that other factors give rise to reasonable suspicion. See Meyers v. City of Chardon, No. 14-2340, 2015 WL 1648992, at *12 (N.D. Ohio Apr. 13, 2015) (officers had reasonable suspicion to stop and question a suspect about a reported drunk driving offense after locating the vehicle that matched dispatch's description but before the officers got close enough to smell alcohol on the suspect). Sadler was reasonable in suspecting Copeland of driving drunk because he found Copeland standing next to a vehicle in the driveway of the exact address the caller saw the drunk driver pull into. As a result, whether Sadler also smelled alcohol on Copeland's breath is immaterial to the question of whether Sadler had reasonable suspicion upon arriving at the scene.

Further, the fact that Sadler attempted to question Copeland in a private driveway poses no barrier to the lawfulness of the Terry stop. See, e.g., O'Malley v. City of Flint, 652 F.3d 662, 670

(6th Cir. 2011) (concluding, as an alternative holding, that an officer's brief investigatory stop of a car and passengers he followed into a private driveway was constitutional); United States v. Clay, 181 F. App'x 542, 543-544 (6th Cir. 2006) (holding that an investigatory stop conducted on a parked car located in a driveway purportedly owned by one of the vehicle's passengers was permissible). Likewise, the fact that the stop continued in the open garage—after Copeland retreated there—does not render the Terry stop unlawful. Just as a suspect cannot defeat a proper warrantless arrest that has been set in motion in a public place by retreating into the suspect's home, United States v. Santana, 427 U.S. 38, 43 (1976), "a person cannot avoid a Terry stop simply by retreating into a home," Rivera v. Washington, 57 F. App'x 558, 562 (4th Cir. 2003). As a result, Sadler was entitled to continue the valid Terry stop in the open garage after Copeland retreated therein. See id.

Having determined that, upon arriving at the scene, Sadler had reasonable suspicion to stop Copeland, the Court turns to the question of whether Copeland was actually stopped and, if so, whether and when the stop converted to an arrest.

### ii. A Stop Occurred and Converted to an Arrest When the Outstanding Warrant was Discovered

When Sadler arrived at the scene, he attempted to stop Copeland to question him about the reported drunk driving offense. However, because Copeland did not yield to Sadler's requests to stop and talk, no seizure occurred at this point. See United States v. Smith, No. 09-147, 2010 WL 1543854, at *8 (E.D. Tenn. Mar. 11, 2010) (finding that no seizure occurred where a suspect did not comply with an officer's instruction to return to the officer and, instead, began yelling that he did not do anything and pivoting away from the officer) (citing Hodari D., 499 U.S. at 626; Smith, 594 F.3d at 536; United States v. Williams, 949 F.2d 220, 222 (6th Cir. 1991)).

Copeland was seized once Sadler handcuffed him, as he was unquestionably restrained at that point.  The mere fact that Sadler handcuffed Copeland, however, does not mean that the seizure constituted an arrest.  An officer may pursue and restrain a suspect who attempts to flee from a lawful stop, without converting the stop into an arrest.  See United States v. Green, 157 F. App'x 853, 857 (6th Cir. 2005) (citing United States v. Dotson, 49 F.3d 227, 230-231 (6th Cir. 1995); United States v. Haye, 825 F.2d 32, 35 (4th Cir. 1987)).  With regards to fleeing, "a suspect who ignores an officer's order to stop and walks away can 'reasonably' be considered to flee, even where the suspect does not run."  Thomas v. City of Eastpointe, 715 F. App'x. 458, 461 (6th Cir. 2017) (quoting United States v. Stittiams, 417 F. App'x 530, 535 (6th Cir. 2011)) (other citation omitted).  And, as discussed above, Sadler had reasonable suspicion to stop Copeland.  Thus, by ignoring Sadler's requests to stop and walking away, Copeland attempted to flee a lawful stop. Consequently, Sadler was entitled to pursue and handcuff Copeland, in order to effectuate the stop. For these reasons, the seizure that occurred at this point constituted a stop, not an arrest.

Having determined that Sadler stopped Copeland, the Court turns to whether and when the stop converted into an arrest.  As part of this inquiry, the Court assess the duration of the stop. Although there is no bright line rule for how long a Terry stop may last before converting into a de facto arrest, the reasonableness of the stop's duration is measured by the yardstick of whether it is reasonably related to the basis for the initial intrusion and the time necessary to determine the suspect's identity.  See Berkemer v. McCarty, 468 U.S. 420, 439 (1984); Houston v. Clark Cnty. Sheriff Deputy John Does 1-5, 174 F.3d 809, 814-815 (6th Cir. 1999).  When an officer's initial queries do not dispel the suspicion that warranted the stop, further detention and questioning are appropriate.  Houston, 174 F.3d at 815.

The Court determines that the stop was not converted to an arrest by the duration of the stop. Copeland testified that he waited in the garage with McKinstry and Otter for "seven to ten minutes." Copeland Dep. at PageID.648. Otter testified that the wait lasted "probably less than five minutes." Otter Dep. at PageID.521. Even assuming that Copeland is correct about the duration of the wait, and even assuming that the entire stop lasted for a few additional minutes because the stop began slightly before McKinstry and Otter arrived at the scene, the duration of the stop was not unreasonable. Other courts have found stops of equal or greater durations to be reasonable. See, e.g., United States v. Jimenez, 446 F. App'x 771, 774-775, 2011 WL 5966507, at *3 (6th Cir. 2011) (stop lasting 15 minutes was reasonable); United States v. Ellis, 497 F.3d 606, 613-614 (6th Cir. 2007) (stop lasting 13 minutes and 39 seconds did not constitute a prolonged seizure); Houston, 174 F.3d at 815 (stop lasting either 35 minutes—as the defendants claimed— or an hour—as the plaintiff claimed—was reasonable). Further, it is clear that the stop lasted no longer than necessary for the officers to identify Copeland and reasonably investigate the basis for the stop—the reported drunk driving offense. Sadler's initial unsuccessful attempt to question Copeland did not dispel his suspicion that Copeland was the drunk driver. Thus, further detention and investigation were appropriate. While McKinstry and Otter stayed with Copeland in the garage, Sadler spoke with the caller who reported the drunk driving, to see whether the caller could identify Copeland and the vehicle parked in the driveway. Although the caller identified the vehicle as the one that he reported seeing, he could not recall whether Copeland was the driver. Sadler checked Copeland's license and, upon realizing that the address on Copeland's license did not match the address of the Bruce Street home, ran Copeland's information through the system. Each of these actions were reasonably related to identifying Copeland or the initial basis for stopping Copeland.

Further, the Court's conclusion that the initial seizure was a stop is not altered by the fact that Copeland may have subjectively believed that he was under arrest, as indicated by his asking of McKinstry before the discovery of the outstanding warrant, "How can [you] let these white officers arrest me?"  McKinstry Dep. at PageID.541.  The test for whether an investigatory stop transformed into an arrest is an objective one.  See Berkemer, 468 U.S. at 422 (a stop is transformed into an arrest if a reasonable individual in the suspect's circumstances would believe that he was in custody and not free to leave).

Although the initial seizure was a stop, it clearly converted to an arrest after Sadler discovered the outstanding warrant for Copeland's arrest.  At that point, Sadler told Copeland that he was being arrested on the warrant, and McKinstry and Otter placed Copeland in their patrol vehicle and transported him to jail.  Other courts have described similar seizures as "traditional arrests."  See Crawford v. Geiger, 656 F. App'x 190, 204 (6th Cir. 2016) (suspect was arrested when placed in handcuffs and later driven to jail); United States v. Stewart, No. 07-00066, 2007 WL 2156704, at *4 (M.D. Tenn. July 25, 2007) (suspect was arrest when handcuffed and told that he was being placed under arrest).

Having determined that the stop, which was supported by reasonable suspicion and was not unreasonably long, converted into an arrest after Sadler discovered the outstanding warrant, the Court turns to the question of whether the officers had probable cause to arrest Copeland at this point.

### iii.  The Officers had Probable Cause to Arrest Copeland

The only question left—whether, after Sadler discovered the outstanding warrant, the officers had probable cause to arrest Copeland—is easily answered in the affirmative.  The existence of a prior warrant is sufficient to establish probable cause, unless there is some legal

basis for holding that the warrant was invalid.  See Davis v. Hutchison, 165 F. App'x 402, 404 (6th Cir. 2006); United States v. Pack, No. 17-43, 2019 WL 6768583, at *8 (W.D. Pa. Dec. 12, 2019) (finding that "because there was a pre-existing warrant for Plaintiff's arrest, the officers had probable cause to arrest him"); Ahmad v. Hudson Cnty. Prosecutor's Office Narcotics Task Force, No. 15-8994, 2016 WL 3450819, at *3 (D.N.J. June 22, 2016) (same).  "Arrest warrants . . . unless facially invalid, are presumed valid."  Fettes v. Hendershot, 375 F. App'x 528, 532 (6th Cir. 2010).

Copeland does not dispute the preexisting warrant's validity.  See Pl. Reply in Support of Pl. MSJ at 14.  Thus, there is no basis for holding that the warrant was invalid.  The valid, preexisting warrant provided the requisite probable cause for the officers to arrest Copeland.  Accordingly, Copeland's motion for summary judgment on his wrongful arrest claim is denied.

### E.  Rule 56(f)

As discussed above, only Copeland moved for summary judgment on his Fourth Amendment seizure claim.  Defendants did not move for summary judgment on the seizure claim.  Further, although Defendants moved for summary judgment on Copeland's Fourth Amendment search claim against McKinstry and Otter, they did not move for summary judgment on this claim against Sadler.  Only Copeland moved for summary judgment on the search claim against Sadler.  Because Defendants did not move for summary judgment on Copeland's Fourth Amendment search claim as to Sadler or Copeland's Fourth Amendment seizure claim against all three officers, the Court cannot grant the officers summary judgment on these claims pursuant to Rule 56(a).  However, Rule 56(f) empowers the Court to enter summary judgment on its own initiative, after giving the parties notice and an opportunity to respond.

The Court hereby gives the parties notice that it may enter summary judgment in favor of Sadler on the Fourth Amendment search claim and in favor of all three officers on the Fourth

Amendment seizure claim.  The record before the Court suggests that Copeland may not be able to show that there is a jury-submissible issue on these claims, even assuming that the home belonged to Copeland.  Material facts concerning these claims do not appear to genuinely be in dispute, including the following: a caller reported seeing a drunk driver pull into 32058 Bruce Street; dispatch relayed this information to the officers; shortly thereafter, Sadler arrived at this exact address and saw a vehicle and Copeland in the driveway; Sadler attempted to question Copeland in the driveway, but Copeland retreated into the open garage; Sadler followed Copeland into the open garage, continuing to ask Copeland to stop and speak with him; and, after discovering a valid, preexisting warrant for Copeland's arrest, the officers transported Copeland to jail.  Based on these undisputed facts,  Copeland may not be able to establish that (i) Sadler lacked reasonable suspicion to stop Copeland in the driveway to question him about the reported drunk driving offense; (ii) Sadler was not privileged to enter the garage to continue the stop when Copeland retreated into the garage; and (iii) the officers did not have knowledge of a valid warrant to arrest Copeland.

The Court will give the parties an opportunity to respond to this Rule 56(f) notice with further briefing and any supporting materials that may affect the Court's decision.  Copeland has until April 29, 2021 to file a brief responding to the Court's Rule 56(f) notice.  Defendants have until 14 days after service of Copeland's brief to file a response to Copeland's brief.  These supplemental briefs may not exceed ten pages, exclusive of attachments.

## IV. CONCLUSION

For the reasons set forth above, Defendants' motion for partial summary judgment (Dkt. 30) is granted, Copeland's motion for partial summary judgment (Dkt. 31) is denied, and Defendants' motion for summary judgment on Copeland's Fourth Amendment search claim

against McKinstry and Otter (Dkt. 34) is granted.  Further, the parties shall comply with the briefing deadlines set forth above.

      SO ORDERED.

Dated: April 15, 2021
     Detroit, Michigan

                                    s/Mark A. Goldsmith
                                    MARK A. GOLDSMITH
                                    United States District Judge